IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARMINE J. ZAPPALA,                    :
                                       :        CIVIL ACTION
              Plaintiff,               :
                                       :
       v.                              :
                                       :
JO ANNE B. BARNHART,                   :        NO.  05-71
Commissioner of Social Security,       :
                                       :
              Defendant.               :

REPORT AND RECOMMENDATION

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

Currently pending before the Court are cross-motions for summary judgment regarding plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title I of the Social Security Act, 42 U.S.C. 401, et seq.  For the reasons which follow, we recommend that plaintiff's motion be denied and defendant's motion be granted.

I.      PROCEDURAL HISTORY

Plaintiff, Carmine Zappala, filed his application for DIB on October 18, 2002, alleging disability since August 5, 1999, due to injuries to his back, neck, both wrists and right shoulder.  (R. 74-78, 80). The state agency denied plaintiff's application on June 18, 2003.  (R. 62-64).  Following a request for review, Administrative Law Judge ("ALJ") Eugene Wisniewski conducted a hearing on July 15, 2004, during which plaintiff and a vocational expert testified.  (R. 25-61, 69).  On October 29, 2004, ALJ Wisniewski issued a decision finding plaintiff not "disabled" for purposes of obtaining benefits.  (R. 8-18). The Appeals Council denied plaintiff's request for review on November 19, 2004, making the ALJ's ruling the final decision of the Commissioner.  (R. 4-6).

On January 7, 2005, plaintiff filed a complaint in this Court seeking judicial review of the

Commissioner's decision.  Challenging the ALJ's finding, plaintiff now claims that the ALJ rejected and/or ignored the stated opinions of treating orthopedic surgeon, Dr. Stephen Latman, as well as those of examining physician, Dr. Mohammad Ali, regarding plaintiff's functional status.

II.     MEDICAL HISTORY

        A.      Vocational Profile

Plaintiff was born on March 5, 1951, making him fifty-three years old at the time of the ALJ's decision.  (R. 47).  He obtained his high school diploma and attended two years of college, as well as some special job training.  (R. 86).  From April of 1984 to October of 1998, plaintiff worked full-time as an electronic technician for the U.S. Postal Service, where he did on-line repair of postal sorting machines, computers, electronic scales and other postal equipment.  (R. 81).  Thereafter, from August 2000 to February 2001 he worked as a sales representative for an in-home business.  (R. 81).

        B.      Medical Evidence

On August 5, 1999, plaintiff was involved in a motor vehicle accident and went to the emergency room at Reading Hospital, where he complained of neck tenderness, a burning sensation in his chest, tenderness in his sternum and right knee pain.  (R. 123-133).  X-rays of his chest and sternum were normal and plaintiff was discharged that day with instructions to apply ice to sore areas and take ibuprofen for pain.  (R. 128, 147-148).

Plaintiff followed up six days later with his family doctor, Tracy Conte, M.D., at St. Lawrence Medical Associates, reporting general bodyaches and tiredness everywhere.  (R. 149).  Further, he remarked that he noticed new problems each day and complained of right knee pain, chest pain from the seatbelt, neck pain and back pain.  (R. 149).  On physical examination, Dr. Conte noted that plaintiff was in no acute distress and had normal range of motion, but experienced pain with almost every movement and with any touch of his chest and back.  (R. 149).  The doctor suspected multiple

2

contusions, gave him Relafen and Tylox for pain and instructed him on various exercises.  (R. 149).

In September, plaintiff returned noting continued stiffness in his neck, right shoulder, right knee and low

back.  (R. 138).  Examination was relatively unchanged.  (R. 138).

On Dr. Conte's referral, plaintiff began a course of physical therapy in early September.  On

October 4, 1999, physical therapist, Joseph Molony, Jr., reported that plaintiff could perform all

activities with respect to the variety and the intensity of his exercises, but continued to experience

discomfort in his back and neck.  (R. 143).  His range of motion in his lumbar spine varied with regard

to flexion, while extension and side bending remained consistently good, with negative straight leg

raising tests.  (R. 143).  Given that plaintiff showed progress, but had symptoms in multiple areas, Mr.

Molony recommended another month of therapy.  (R. 143).

Subsequently, the record is devoid of treatment until April 5, 2000, when plaintiff returned to

Dr. Conte.  (R. 138).  Plaintiff reported that he had stopped the physical therapy because of snow storms,

had been unemployed since the car accident and still experienced pain, which was somewhat relieved

by Tylenol and aspirin.  (R. 138).  He wore a back brace to the examining room and asked whether he

should seek counsel for a law suit.  (R. 138).  On examination, Dr. Conte remarked that plaintiff chose

to stand and had normal range of motion of his neck, but experienced pain with repetitive motion and

any touching of his back.  (R. 138).  The doctor was somewhat suspicious of plaintiff's complaints and

questioned underlying secondary gain as a motive.  (R. 138).  Nonetheless, she recommended that

plaintiff complete a course of physical therapy and then see a specialist if he wanted.  (R. 138).

Over the next year and half, plaintiff sought no additional medical treatment and did not attend

any physical therapy.  (R. 232).  On October 19, 2001, plaintiff met with Stephen Latman, M.D., at

Reading Orthopedic Associates, complaining of neck pain, lower back pain, left and right wrist pain and

pressure in the chest, all resulting from his motor vehicle accident.  (R. 232).  He explained that he could

3

only sleep about ninety minutes at a time, had difficulty rolling out of bed, could not perform sudden movements without pain, had pressure in the coccyx and kidney areas, had trouble standing still for any length of time, could walk well on a level area but not uneven ground or slopes, suffered neck pain when coughing and sneezing, wore a lower back brace when driving and could not carry anything especially on stairs. (R. 232). For treatment, he took aspirin "like crazy," used Relafen sparingly due to its discoloration of his skin and followed a home exercise program. (R. 232). Plaintiff reported that at the time of his accident he was between jobs and had started a new job about a year ago. (R. 232). He worked sixteen hours a week answering telephones and packing light objects weighing no more than fifteen pounds. (R. 232). Although he tried working at Pizza Hut once, it lasted about ten minutes due to his inability to stand still very long. (R. 232).

On examination, Dr. Latman found that plaintiff had normal stance and gait, no abnormal spinal curve or instability, tenderness in his cervical paraspinal muscles with no spasm, full flexion with a feeling of pain and pressure on the right side of his neck, cervical extension and rotation with pain, lumbar muscle tenderness with no spasm, and pain on flexion, extension and bending of the lumbar area. (R. 232). Straight leg raising caused lower back pain on both sides and an x-ray revealed some facet joint arthropathy at L5-S1. (R. 233). Dr. Latman diagnosed him with cervical strain and lumbar strain superimposed on pre-existing degenerative changes and muscle atrophy in the left calf. (R. 233). He gave him samples of Vioxx and told him to perform home exercises and use hot packs. (R. 233).

The following month, on November 9, 2001, plaintiff returned for follow-up with Dr. Latman, indicating that the Vioxx was not helping his pain. (R. 233). Plaintiff complained of back pain when walking on the hard marble floors in the mall causing him to sit and rest occasionally, neck pain when driving causing him to wear a lumbosacral support in the car, and wrist and elbow pain causing him to wear an elastic brace on his left wrist. (R. 233). Following examination, the doctor's impression was

4

unchanged.  By the end of November, straight leg raising tests were negative, but plaintiff still had cervical and lumbar paraspinal muscle tenderness, with limited motion in both areas.  (R. 234).  Dr. Latman diagnosed him with cervical and lumbosacral strain, spondylopathy and muscle atrophy in his left calf.  He prescribed an aquatic exercise program.  (R. 234).

Due to cataract surgery in December of 2001, plaintiff did not immediately begin his aquatic therapy.  (R. 234).  He returned to Dr. Latman in January and February of 2002, where physical examinations showed normal stance and gait, no abnormal spinal curve or instability, cervical muscle tenderness bilaterally with no spasm, cervical pain at ends of range of motion, lumbar paraspinal tenderness, lumbar pain at 60 degrees flexion or full extension, uncomfortable side bends, normal straight leg raises, normal reflexes, normal sensation and pulses to all four extremities and a generalized decrease in muscular strength.  (R. 234-235).  Dr. Latman opined that plaintiff should stay out of work and treat with over-the-counter analgesics and heat.  (R. 234-235).

Plaintiff began physical therapy on March 1, 2002.  (R. 203).  At his initial evaluation, plaintiff reported that he was currently looking for a job and had just finished a temp position.  (R. 203).  His physical complaints included pain, range of motion restrictions and postural dysfunction.  (R. 203). Thereafter, he attended therapy through at least November 21, 2003, during which his participation was repeatedly deemed to be good.  (R. 158-203).  On re-evaluation at the end of March, plaintiff felt he was getting stronger overall.  (R. 197).  In April, plaintiff reported some severe pain on a few occasions, but felt improvement by the end of the month.  (R. 190, 192, 195).  By May, plaintiff showed gradual progress with better pain management, range of motion and strength.  (R. 184).

During his nine months of therapy, plaintiff returned for monthly follow-up with Dr. Latman. (R. 235-241).  At the end of March, 2002, plaintiff felt that he was getting weaker and limped after one-half block of walking.  (R. 235).  The doctor noted an antalgic shuffling gait, cervical muscle tenderness,

spasm in his paraspinals and upper shoulders, lumbar muscle tenderness with no spasm, positive straight leg raising and a 50% normal range of motion.  Again, he commented that plaintiff was to remain out of work.  (R. 236).  The following month, plaintiff reported that physical therapy was helpful, but he had worsening neck pain, developed problems using the stairs and discontinued use of Relafen due to its side effects.  (R. 236).  In May, he felt like he was getting stronger and had pain-free straight leg raising, but still experienced cervical, thoracic and lumbar muscle tenderness with limited range of motion.  (R. 237).  By June, he complained that his neck and shoulders were uncomfortable, he had pain when twisting in bed or in the shower, could not go up and down stairs quickly and suffered a flare-up when lifting the hood of his car.  (R. 237).  On examination, he had a normal stance and gait, no spasm anywhere and good cervical range of motion with some discomfort on extreme rotations, but some remaining tenderness and lower back restrictions on range of motion.  (R. 237).  His July visit revealed good flexion in his neck, but remaining tenderness and pain with left leg straight leg raises.  (R. 238). During his September appointment, plaintiff reported problems sleeping and occasional sharp lower back pain with no sciatica.  (R. 238).  He further indicated that he used a soft collar and lumbosacral brace and experienced an increase in symptoms when driving.  (R. 238-239).  Although he still had tenderness in his cervical and lumbar muscles and limited lumbar range of motion, he had good range of motion in his cervical muscles and wrists.  (R. 239).  October findings had comparable complaints and findings.  (R. 240-241).  In November, plaintiff had pain with all motions of his neck and complained of more frequent muscle spasms in the neck and lower back.  (R. 241).

The last physical therapy note is dated November 21, 2002, at which time plaintiff reported improved strength, posture and endurance, together with less pain.  (R. 158).  He still described his lower back pain as a seven out of ten and  his left wrist pain as a nine out of ten.  (R. 158).

On December 20, 2002, plaintiff returned to Dr. Latman alleging pain with prone lying, muscle

spasms, tightness in his neck and lower back, an inability to lift anything and pain when hitting a bump in the road.  (R. 246).  He was using Tylenol with Codeine occasionally and Bextra or Celebrex routinely, but had not yet tried Norflex for his muscle spasm.  (R. 246).  The doctor found tenderness throughout the cervical, lumbar and left wrist area and again instructed him to do no work.  (R. 246).

At the request of plaintiff's attorney, Dr. Latman prepared a summary of his treatment and opinions, dated January 6, 2003.  (R. 230-231).  He remarked that, since beginning his treatment of plaintiff in October of 2001, he prescribed anti-inflammatories, muscle relaxers, analgesics, home exercise, hot packs, physical and aquatic therapy, a soft cervical collar, an orthopedic chair pillow, a back brace and a wrist brace.  (R. 230).  Ultimately, he diagnosed plaintiff with multiple contusions, cervical soft tissue strain, lumbosacral soft tissue strain superimposed on degenerative spondylosis, muscle atrophy left calf and tenosynovitis left wrist.  (R. 231).  He believed that maximum medical improvement had not been achieved and that ongoing treatment was appropriate, but that recovery prognosis was poor since symptoms had been present consistently for longer than two years.  (R. 231).

On January 31, 2003, plaintiff underwent a disability examination with Francisco Daniels, D.O. at Shillington Internal Medicine.  (R. 213-215).  Plaintiff complained of chronic pains in the neck, wrists and back and explained that, in terms of pain, he had good days and bad days.  (R. 213).  On examination, Dr. Daniels remarked that plaintiff had good cervical, lumbar and wrist range of motion with pain at the upper limits.  (R. 214).  The doctor, however, found no obvious signs of impediment and believed the limitations were physiologic in nature.  (R. 214).  He opined that plaintiff had chronic back, wrist and neck pain secondary to his August 1999 motor vehicle accident.  (R. 214).  At that time, he appeared essentially stable, although he still required the use of nonsteroidals, as well as continuing physical therapy, to control his pain.  (R. 214).  Subsequently, Dr. Daniels described plaintiff's functional capabilities, noting 5/5 strength in his right hand and 4/5 strength in his left hand.  (R. 216).

7

Further, plaintiff had no impediment in any fine and dextrous movements, including turning pages of a book, tying shoes, sifting small objects, dialing a telephone or using push buttons.  (R. 216).

Plaintiff continued to treat with Dr. Latman in February, March and May 2003 with continued weather-related complaints, allegations of stiffness and pain in his neck, wrist and lower back, particularly when active, difficulty lifting and a need to regularly use both medication and physical therapy.  (R. 245).  Dr. Latman noted no paresthesias or radiation of pain, normal reflexes, sensation and strength, cervical and lumbar muscle tenderness with no spasm and occasionally positive straight leg raises.  (R. 245).  In March, Dr. Latman instructed him to do no work and, in May, he noted that plaintiff had a right antalgic gait.  (R. 244).

State disability doctor, Mohammad Ali, M.D., met with plaintiff on May 1, 2003.  (R. 218-226).  Examination revealed that he had slight difficulty getting on and off the examining table, difficulty crouching and kneeling, normal range of motion of all the joints including the back and neck, 100% grasp strength in both hands and no problems with fine and dexterous movements other than some difficulty with buttoning and unbuttoning his shirt.  (R. 220).  Neurologically, Dr. Ali found normal deep tendon reflexes, no significant sensory deficit, good coordination, normal gait and straight leg raising to 80 degrees on the right and 60 degrees on the left.  (R. 220).  He assessed him with pain in multiple areas of the body including shoulders, back and wrists.  (R. 220).  A subsequent x-ray ordered by Dr. Ali, however, revealed only minor arthritic changes in the left and right wrists, but soft tissue injury could not be excluded.  (R. 227-228).  Opining on plaintiff's limitations, Dr. Ali remarked that plaintiff could frequently lift and carry up to twenty pounds, stand and walk one to two hours in an eight-hour day, sit two to three hours in an eight hour day, was limited in both upper and lower extremities due to wrist and low back pain, could frequently balance but only occasionally bend, kneel, stoop, crouch and climb and should avoid exposure to various chemical agents.  (R. 222-223).

From July 2003 to February 2004, plaintiff saw Dr. Latman three more times.  (R. 242-244).
The notations still indicated stiffness in his neck and low back, together with accompanying muscle tenderness and spasms.  (R. 242-244).  In July, Dr. Latman instructed plaintiff to do no work.  (R. 243).  In September, however, plaintiff indicated that he was planning to try a light quality control job in January.  (R. 243).  By February 2004, however, plaintiff had not returned to work and Dr. Latman indicated that he should not work.  (R. 242).  Plaintiff attended no additional treatment after that date.

      C.     <u>Administrative Hearing Testimony</u>

At the administrative hearing on July 15, 2004, plaintiff testified that his disability began on August 5, 1999, when he was injured in an automobile accident.  (R. 32).  Since that date, he was employed once from August 23 to December 21, 2001, doing reception work and light packing for his friend's home-based business.  (R. 32-33).  Although he was there for eight hours, he would sit or lie down for most of the day.  (R. 33).  Before the accident, he worked as an electronics technician for the Post Office from 1984 to 1998, but left shortly after his mother passed away.  (R. 33-36).

Turning to his impairments, plaintiff testified that he has problems in both wrists for which he wears a brace, but can lift a half gallon of milk and drive at least four times per week to the mall.  (R. 37-38).  With regards to his back, he explained that he has pain in his neck going into both shoulders, for which he takes over-the-counter Tylenol and Tylenol with Codeine.  (R. 38-39).  In addition, he takes Soma to help him sleep and Bextra, which is a non-steroid anti-inflammatory.  (R. 39).  He is able to bend at the waist with pain, has varying range of motion in his neck and sometimes wears a cervical collar for preventative purposes.  (R. 39-40).  Plaintiff stated that he can only sit three to twenty minutes at a time, but can walk fairly well.  (R. 40-41).

As for his activities of daily living, plaintiff explained that he gets up around 8:00 or 9:00 in the morning, washes up, takes a walk around the block and up and down a hill, has lunch and then sits or

lies on the couch in the afternoons.  (R. 42).  Often, he will lie down for hours to take the pressure off of his back.  (R. 42).  He prepares microwave meals and tries to clean his house, but has difficulty picking things up.  (R. 42-43).  Socially, he is an amateur Ham radio operator.  (R. 43).

On questioning by his attorney, plaintiff testified that his left wrist always hurts and he wears a brace on the right mainly for driving.  (R. 44-45).  His wrists limit his ability to brush his teeth with a manual toothbrush, open bottles, turn certain door handles, use any kind of tools, write for an extended period and type on his computer.  (R. 45-47).  Additionally, due to spasms in his neck, right shoulder and lower back, he can only sit for about twenty minutes.  (R. 47).  When he has these spasms, which happen more frequently in colder weather, he needs to lie down for at least twenty minutes.  (R. 47-48).

Plaintiff then explained that his days have different degrees.  (R. 49).  On a good day, he can take a shower, move around with limitations and open a package.  (R. 49).  On a bad day, he just stays in bed all day, getting up only to use the bathroom.  (R. 49-50).  He has bad days three to five times a week and sometimes the whole week depending on the weather.  (R. 50).  Even on better days, though, he lies down approximately four times a day for 20-30 minutes each.  (R. 50).  With regard to the side effects of his medication, plaintiff indicated that Relafen gave him spots and Soma causes incontinence.  (R. 51).  Finally, plaintiff testified that he could hold a job if he only had to work one to two days a week, but would otherwise be unreliable.  (R. 52).  He had, however, looked for work.  (R. 52).

Thereafter, vocational expert ("VE") Patricia Vasco testified regarding plaintiff's ability to perform substantial gainful activity.  (R. 53).  First, she classified plaintiff's past relevant work as skilled and medium exertional work.  (R. 55).  The ALJ then asked her to consider the following hypothetical:

> I want you to consider a male individual.  I want you to consider the individual is now 53 years of age.  I want you to consider the individual has more than a high school education.  I want you to consider the individual being limited to a light exertional level. I want you to consider occupations that would permit a sit/stand option.  I want you to consider occupations that would be performed in a controlled environment as to

temperature and as to dampness.  I want you to consider that the individual can and does drive as he has testified to.  I want you to consider that the individual would require an occupation that would not involve continuous, repetitive use of his hands and wrists.  I do want you to consider, however, that the individual has . . . grasp strength of 100 percent in both of the hands.  As to fine and dexterous movement of the hands, there is difficulty in buttoning and unbuttoning a shirt.  But he can pick up a coin.  He can use his hands to open and close a drawer and he can use his hands to push buttons although he does it a little slower than the average person would do it.  I want you to consider the individual can and does use a computer for ten to 20 minutes, which would involve the use of his fingers.

(R. 56).  In response, the VE noted that such an individual could work as an order desk caller, office helper and cafeteria cashier, all of which exist in significant numbers in the regional and national economies.  (R. 56-57).  Adding in the limitation that plaintiff would need to lie down four times per day for half an hour each, the VE noted that he could not get four half hour work breaks in any of the jobs mentioned.  (R. 58).  Likewise, the VE conceded that if plaintiff had to stay in bed all day anywhere from one to five days a week, employers would not tolerate his absence.  (R. 59).  Finally, crediting the sitting, standing and walking limitations imposed by Dr. Ali in his medical source statement, the VE opined that plaintiff would be unable to work an eight-hour day, but could still be a part-time cafeteria cashier.  (R. 59-60).

III.    THE ALJ'S DECISION

On August 17, 2004, the ALJ issued a decision finding plaintiff not disabled for purposes of benefits.  (R. 11-18).  Under step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 5, 1999.[1]  (R. 12).  He then concluded that plaintiff's cervical and lumbar pathology and left wrist synovitis were "severe"

---

[1]  The Commissioner has promulgated a five-step sequential analysis, which is used to evaluate claims of disability, as follows:  (1) whether the claimant is engaged in substantial gainful employment; (2) whether the claimant suffers from a "severe" impairments; (3) whether the impairment meets or equals the severity of a listed impairment; (4) whether the claimant can return to his past relevant work; and (5) whether the claimant has the residual functional capacity to engage in other work in the national economy.  20 C.F.R. § 404.920(b)-(g) (2003).

impairments within the meaning of the Social Security Act, but that plaintiff's subjective allegations with regards to his right shoulder problems did not constitute a severe impairment.  (R. 12). Nonetheless, the ALJ declined to find that plaintiff had any impairment which met or equaled the criteria of Listings 1.02 or 1.04.  (R. 12).

Turning to an assessment of plaintiff's residual functional capacity, the ALJ first considered plaintiff's subjective complaints of pain.  (R. 13-14).  Based on plaintiff's demeanor at the hearing, his activities of daily living, the absence of objective support, his family doctor's suspicion of plaintiff's complaints and the limited treatment regimen, the ALJ deemed his allegations of disabling pain excessive, and his testimony not fully credible.  (R. 13-14).  Thereafter, the ALJ summarized all of the medical evidence of record, according significant weight to the treatment notes, but little weight to the report of Dr. Ali and the January 6, 2003 letter of Dr. Latman.  (R. 15-16).  Taking all of this evidence in conjunction, the ALJ concluded that plaintiff had the residual functional capacity to perform light exertional work with a sit/stand option and with no repetitive use of the wrists.  (R. 15).  He found, however, that plaintiff could drive, use his hands to push buttons and operate a computer for 10-20 minutes at a time.  (R. 15).

Lastly, the ALJ opined that plaintiff could not perform his past relevant work, which was at the medium exertional level.  (R. 16).  Based on the testimony of the vocational expert, however, the ALJ concluded that plaintiff could work as an order desk caller, an office helper and a cafeteria cashier.  (R. 16).  As such, he deemed plaintiff not entitled to disability insurance benefits.  (R. 17).

III.     STANDARD OF REVIEW

On judicial review of a final decision from the Commissioner of Social Security, a court must determine whether the Commissioner's ruling is supported by substantial evidence. 42 U.S.C. § 405(g); Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000); see also Plummer v.

Apfel, 186 F.3d 42,, 427 (3d Cir. 1999) (a reviewing court is "bound by the ALJ's findings of fact if

they are supported by substantial evidence in the record."). "Substantial evidence" does not mean "a

mere scintilla," but rather indicates such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427

(1971); Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Accordingly, the court's scope of review

is "limited to determining whether the Commissioner applied the correct legal standards and whether

the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact."

Gilmore v. Barnhart, 356 F. Supp.2d 509, 511 (E.D. Pa. 2005) (quoting Schwartz v. Halter, 134 F.

Supp.2d 640, 647 (E.D. Pa. 2001).

IV.    DISCUSSION

Plaintiff's first allegation concerns the ALJ's discussion of Dr. Latman's assessment, as

supported by the report of Dr. Ali, and whether or not the ALJ properly considered it in formulating a

residual functional capacity assessment.  "'Residual functional capacity' is defined as that which an

individual is still able to do despite the limitations caused by his or her impairment(s)." Hartranft v.

Apfel, 181 F.3d 358, 359 n. 1 (3d Cir. 1999) (citing 20 C.F.R. § 404.1545(a)).  In making a residual

functional capacity determination, the ALJ must consider all evidence before him. Burnett, 220 F.3d

at 121.  "Although the ALJ may weigh the credibility of the evidence, he must give some indication of

the evidence which he rejects and his reason(s) for discounting such evidence." Fargnoli v. Massanari,

247 F.3d 34, 43 (3d Cir. 2001).

It remains well-established, under applicable regulations and controlling case law, that "opinions

of a claimant's treating physician are entitled to substantial and at times even controlling weight."

Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)).  A treating source's opinion on the issue

of the nature and severity of a claimant's impairment will be given controlling weight if the opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Such deference is accorded especially "when the[ir] opinion[s] reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer, 196 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also 20 C.F.R. § 404.1527(d)(2). Moreover, where the treating physician is a specialist his opinion is entitled to even greater deference. See Mason v. Shalala, 994 F.2d 1058, 1066-1067 (3d Cir. 1993); 20 C.F.R. § 404.1527(d)(5).

"An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) (quotations omitted).  When an ALJ elects to disregard a treating physician's opinion, he must explain on the record his reasons for doing so. Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  It cannot be "for no reason or for the wrong reason." Morales, 225 F.3d at 317.

In the case at bar, Dr. Latman opined, on January 6, 2003, that plaintiff had multiple contusions, cervical soft tissue strain, lumbosacral soft tissue strain superimposed on degenerative spondylosis, muscle atrophy left calf and tenosynovitis of the left wrist.  (R. 231).  He believed that maximum medical improvement had not been achieved and ongoing treatments were appropriate, but the prognosis for recovery was poor, as symptoms had been present for longer than two years.  (R. 231).  The ALJ deemed the contents of this letter to be unpersuasive.  (R. 15-16).

Our review of the record finds substantial evidentiary support for the ALJ's ruling.  Under social

security regulations, the proper weight to be given a treating physician's opinion is directly related to the degree to which such opinion is supported by clinically acceptable objective medical data and laboratory results.  20 C.F.R. § 404.1527.  As such, the ALJ is not bound to accept the treating physician's conclusions if there is insufficient clinical data to support them.  See Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985) (finding ALJ justified in rejecting treating physician's unsupported medical conclusions).  In this case, as noted by the ALJ, there were no clinical findings evidencing any type of major injury which could have caused plaintiff's symptoms.  For example, immediately after the car accident, x-rays of plaintiff's chest and sternum were normal.  (R. 128, 147-148).  In October of 2001, an x-ray showed only some facet joint arthropathy in the lumbosacral spine.  (R. 233).  Dr. Daniels found no obvious sign of impediment in any area and believed most limitations to be "physiologic" in nature.[2]  (R. 214). Dr. Ali noted no neurological deficits.  (R. 220).  Finally, a May x-ray of his wrists revealed only minor arthritic changes.  (R. 220).

In light of the absence of objective conditions to explain plaintiff's symptoms, Dr. Latman relied almost entirely on plaintiff's own complaints and subjective responses to various examination techniques in order to diagnose and opine on plaintiff's condition.  Based on such complaints alone, Dr. Latman found plaintiff disabled and indicated that he should not work.

Such findings, however, fail to merit controlling weight on several grounds.  First, although Dr. Latman, as a treating physician, had the benefit of continuing observation over an extended period, his findings often stood in direct contradiction to three other examining doctors.  Plaintiff's family physician, Dr. Conte, noted normal range of motion, albeit with pain, but no other clear injuries.  (R.

---

[2]  "Physiologic" means "normal; not pathologic; characteristic of or conforming to the normal functioning or state of the body or a tissue or an organ . . ."  Dorland's Illustrated Medical Dictionary, Twenty-eighth Edition, p. 1290 (1994) ("Dorland's").

138).  Dr. Daniels found no obvious sign of impediment in any area and believed range of motion to be almost completely normal with only some elicitation of pain on movement.  (R. 214).  Dr. Ali observed 100% grasp strength in both hands, no neurological deficits, normal gait, and normal range of motion in all joints including the back and neck.[3]  (R. 220).  Finally, even Dr. Latman himself found, on multiple occasions, that plaintiff had no spasm, good range of motion, pain-free straight leg raising, improving strength, normal sensation and normal reflexes in all extremities.  (R.233-245).  Accordingly, Dr. Latman's opinion regarding plaintiff's disability was simply not consistent with the record as a whole.  See 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Moreover, and perhaps more importantly, Dr. Latman's significant reliance on plaintiff's self-reporting detracted substantially from the persuasiveness of his opinion.  "[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."  Morris v. Barnhart, 78 Fed. Appx. 820, 824 (3d Cir. 2003).  Rather, "[a]n ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted."  Morris, 78 Fed.

---

[3]  Plaintiff takes issue with the ALJ's rejection of Dr. Ali's residual functional capacity assessment, wherein he opined that plaintiff could stand and walk only one to two hours in an eight-hour day and sit two to three hours in an eight hour day.  (R. 222-223).  He contends that, notwithstanding the fact that this opinion would not permit any full-time work, the ALJ failed to accord it proper weight and deem plaintiff disabled.

While at first blush, this argument seems to have merit, a closer look at Dr. Ali's full examination report undercuts plaintiff's claim.  During his physical examination of plaintiff, Dr. Ali remarked that plaintiff had normal range of motion in all joints, minimal difficulty getting on and off the examination table, no significant sensory deficit, 100% grasp strength in both hands, relatively little problem with fine and dexterous movements, normal gait, negative straight leg raising, good coordination and normal deep tendon reflexes.  (R. 220).  His report reflects few, if any, medical problems.  (R. 220).  Notwithstanding these relatively benign findings, Dr. Ali subsequently completed a checklist form deeming plaintiff extremely limited in his standing and walking abilities.  (R. 222).  These findings create an internal inconsistency within the report.  An ALJ is "entitled to place greater reliance on the doctor's full medical opinion than his cursory answers to ... interrogatories."  Plummer, 186 F.3d at 430; see also Metz v. Barnhart, Civ. A. No. 01-5798, 2004 WL 1237423, *12 (E.D. Pa. May 5, 2004) (citing Plummer).  Hence, the ALJ's decision to rely on Dr. Ali's written report over his unexplained and unsupported checklist evaluation stands well-supported by substantial evidence.

Appx. at 825 (citing Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989)); see also Clements v. Apfel, 76

F. Supp.2d 599, 603 (E.D. Pa. 1999) (It was reasonable for the ALJ to discount a medical opinion based

solely on a patient's subjective complaints rather than objective medical evidence."). Accordingly, to

the extent the ALJ's credibility determination was well-supported by substantial evidence, his

discounting of Dr. Latman's opinion likewise would withstand judicial scrutiny.

Upon review, the Court finds the ALJ's discussion of plaintiff's credibility to be nothing short

of a thorough and cogent application of the pertinent jurisprudence to the facts of record. An ALJ is

required to "give serious consideration to a claimant's subjective complaints of pain [or other

symptoms], even where those complaints are not supported by objective evidence." Mason v. Shalala,

994 F.2d at 1067 (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)). Objective evidence

of the symptoms themselves need not exist, although there must be objective evidence of some

condition that could reasonably produce them. Green v. Schweiker, 749 F.2d 1066, 1070-71 (3d Cir.

1984). Where medical evidence supports a claimant's complaints, the "complaints should then be given

'great weight' and may not be disregarded unless there exists contrary medical evidence." Mason, 994

F.2d at 1067-68. The ALJ, however, "has the right, as the fact finder, to reject partially, or even entirely,

such subjective complaints if they are not fully credible." Weber v. Massanari, 156 F. Supp.2d 475, 485

(E.D. Pa. 2001) (citing Baerga v. Richarson, 500 F.2d 309, 312 (3d Cir. 1974).

Under 20 C.F.R. § 404.1529(c)(3), the kinds of evidence that the ALJ must consider in addition

to the objective medical evidence when assessing the credibility of an individual's statements include

the individual's daily activity; location, duration, frequency and intensity of the individual's symptoms;

factors precipitating and aggravating the symptoms; the type, dosage, effectiveness and side effects of

medication taken to alleviate the symptoms; treatment, other than medication, received for relief of the

symptoms; any non-treatment measures the individual uses to relieve pain or symptoms; and other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. Id. Moreover, the ALJ should consider the claimant's statements, appearance and demeanor; medical signs and laboratory findings; and physicians' opinions regarding the credibility and severity of plaintiff's subjective complaints. Weber, 156 F. Supp.2d at 485 (citing SSR 96-7p, 1996 WL 374186 (S.S.A. 1996)). Ultimately, the ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001) (quoting SSR 96-7p, supra; Schaudeck v. Commissioner of Social Security Administration, 181 F.3d 429, 433 (3d Cir. 1999)).

In the case at bar, the ALJ, relying on these enumerated factors, appropriately elected to discredit plaintiff's testimony that he was completely limited by his impairments. First, the ALJ considered the plaintiff's demeanor at the hearing and physician opinions regarding his credibility – both of which are appropriate factors in his analysis. See Weber, 156 F. Supp.2d at 485. Specifically, he commented that, based on [plaintiff's] demeanor as a witness he tended to somewhat exaggerate the scope of his limitations." (R. 13). Moreover, the ALJ highlighted Dr. Conte's musing that she was "somewhat suspicious" of plaintiff's complaints of pain and she questioned "underlying secondary gain getting in the way of his recovery." (R. 138).

Next, the ALJ identified several inconsistencies in plaintiff's testimony, which detracted from his overall credibility. For example, plaintiff stated that he could only sit three to twenty minutes at a time. (R. 40). Yet, he could drive seven miles each way to the mall, four times per week, (R. 37-38),

and go on three extended driving trips in April and August of 2002.  (R. 173, 176,194).  As SSR 96-7p specifically directs that an "adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances," the ALJ justifiably cited to these portions of the record.  1996 WL 374186, at *5.

Third, the ALJ remarked that, aside from being internally inconsistent, plaintiff's statements were inconsistent with other evidence in the record.  As noted in detail above, the record remains devoid of any objective findings which would support the degree of symptomology he allegedly experienced.  In fact, the evidence often contradicted his allegations of limitation.  Plaintiff claimed to be unable to open bottles, turn certain door handles, use any kind of tools and write or type for extensive periods due to his wrists.  (R. 45-47).  Dr. Daniels, however, found that plaintiff had 5/5 strength in his right hand, 4/5 strength in his left hand, and no impediment in picking up coins from a flat surface, fastening buttons or snaps, zipping zippers, turning pages of a book, tying shoes, putting on clothing, lifting small objects, opening doors or drawers, dialing a telephone or using push buttons.  (R. 216).  Likewise, Dr. Ali determined that plaintiff had normal range of motion in his wrists and hands, 100% grasp strength in both hands, and no limitations in fine and dexterous movements, save for some difficulty buttoning and unbuttoning his shirt.  (R. 200).  In addition, plaintiff alleged that he needed to lie down four times per day for twenty to thirty minutes each.  (R. 50).  As noted by the ALJ, though, nothing in the record supported such a limitation.  SSR 96-7p specifically dictates that an ALJ should consider "[t]he degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment."  Id. at *5; see also 20 C.F.R. § 416.929©)(2) ("Objective medical evidence of this type is a useful indicator to assist [the ALJ] in making reasonable conclusions about the intensity and

19

persistence of [plaintiff's] symptoms and the effect those symptoms, such as pain, may have on [plaintiff's] ability to work.").

Fourth, the ALJ recounted plaintiff's activities of daily living in finding that he could perform some form of substantial gainful activity. Plaintiff drove to the mall four times per week, apparently spending some time walking through the stores. (R. 37-38, 233). Further, as noted above, he was able to go on at least three longer driving trips during the course of his physical therapy. (R. 173, 176, 194). Plaintiff also testified that he talks a walk around the block almost every single day, up and down a hill. (R. 41-42). Finally, he lives by himself, can clean his house, albeit with difficulty picking things up, and can do and fold laundry. (R. 42-43). He climbs two to three flights of stairs a day, does his own grocery shopping and can load and unload bags from his car. (R. 96, 97). Social Security Ruling 96-7p directs an ALJ to consider an individual's daily activities in making a credibility determination. See 1996 WL 374186, at *3. Although "sporadic or transitory activity does not disprove disability," Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981), plaintiff's rather extensive daily routine suggests that he is able to do more than he would have had the ALJ believe.

Finally, the ALJ remarked that the treatment notes reflect that plaintiff's condition "was stable and under good control with very conservative measures." (R. 14). From the date of his car accident in August of 1999 to October 19, 2001, plaintiff saw his family doctor on only four occasions. (R. 138, 149). He also underwent physical therapy beginning in September of 1999, but failed to complete the full course and stopped going by the winter due to snow storms. (R. 138). Indeed, for a full year and a half, plaintiff sought absolutely no medical treatment whatsoever. On October 19, 2001, two years after his accident, plaintiff first met with orthopedic specialist Dr. Latman. While under Dr. Latman's care, he underwent very conservative treatment including a lengthy course of aquatic physical therapy, non-narcotic pain medication and over-the-counter anti-inflammatory medication. At no point did the

20

doctor ever prescribe or even suggest the use of narcotic pain mediation, epidural injections or any type of surgery.  In January of 2003, Dr. Daniels described plaintiff's condition as "essentially stable."  (R. 214).  Thereafter, from February 2003 to the hearing date in July 2004, plaintiff saw Dr. Latman only six times.  (R. 242-244).   As noted in SSR 96-7p, an individual's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. " Id. at 1996 WL 374186, *7.  Since plaintiff provided no explanation for his absence of treatment, the ALJ was justified in relying on this factor to discredit him.

In short, "it is well within the discretion of the Secretary to evaluate the credibility of a plaintiff's testimony and to render an independent judgment in light of the medical findings and related evidence regarding the true extent of such disability." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996).  Once the ALJ provided such a thorough and well-reasoned basis for discrediting plaintiff's subjective complaints, he was entitled to disregard the assessment of Dr. Latman, which was based almost entirely on such complaints.  Accordingly, we find no basis for reversal or remand.

Notwithstanding the limited weight given to Dr. Latman and plaintiff's subjective complaints of pain, the ALJ still credited many of the alleged limitations.  Specifically, he noted that he had the residual functional capacity to perform light exertion work with a sit/stand option, with no repetitive use of the wrists and with no more than 10-20 minutes of computer use at a time.  (R. 15).  Such a residual functional capacity assessment stands well-supported by the medical evidence of record and warrants affirmation by this  Court.

Therefore, I make the following:

<u>RECOMMENDATION</u>

      AND NOW, this         day of *October*, 2005, IT IS RESPECTFULLY RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED and the Defendant's Motion for Summary Judgment be GRANTED.

_____
CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE
